and 12-6354 U.S.A. v. Donald Fillers. Oral argument not to exceed 10 minutes for each defendant and 20 minutes for the plaintiff. And Mr. Flores, we'll begin for the appellant. Thank you, ma'am. Morning. Good morning, your honors. May it please the court, I'm Robin Rubin Flores for the appellant, James Mathis, in this matter. I respectfully request two minutes for rebuttal. Okay, you're dividing your time equally, 10 minutes? I believe we are, judge. Your honor, when I first got involved in this case, I got involved in the sentencing. It was not a trial. And in my involvement in this matter, after looking at the totality of the evidence, and I think the court may agree with me eventually, a commercial comes to mind, an old one, from Wendy's, where we've got a big bun, we've got three people looking at the big bun, they pull the big bun off, and one of the people says, where's the beef? And that's what we have here, is where's the beef in this case? I submit to the court that the evidence in this matter, and one of my main arguments I'd like to hit on is that the verdict was contrary to the weight of the evidence. We have lots of bun, and in this case, almost no beef. This matter started, going back to 2003, involving a demolition project of an old yarn factory known as Standard Cooper, Coosa-Thatcher facility. Mr. Mathis, my client, was contracted, and that contract appears in Exhibit 88 in the record, to do the demolition. And in that contract, that he was to obtain or secure somebody to do the abatement. There was much back and forth through the evidence here as to Mr. Mathis' involvement in this case, and most of it dealt with Mr. Mathis actually performing demolition. Now, we heard lots of other evidence of the other co-defendants here, Mr. Don Fillers, Mr. Gary Fillers, and Mr. Woods, and having hands-on, and being on the property, doing a walk-through when there was surveys to be done prior to the, according to the NESHAP requirements, to determine what amount of asbestos may be in this facility. Mr. Mathis was never a part of that, and there was at least two separate corporations, and memory doesn't fail me, three separate corporations or companies that came in and did surveys of this property. Mr. Mathis was never a part of the surveys. Then we hear evidence about individuals such as Mr. Woods, one of the co-defendants here, going through at night, removing properties or materials that were suspected ACM, asbestos-containing materials, and disposing of them improperly in a dumpster. We hear testimony throughout this case about Mr. Fillers, and Don Fillers, and Gary Fillers, having objections to proposals of how much it would cost for abatement, and a discussion between Don Fillers and Halbert Warden, who was one of the individuals who actually performed the abatement, as to about who would pay for what amounts. Then we hear that Mr. Warden had an argument with Don Fillers about, hey, look, your guy, Mr. Woods, has been removing this lagging and these other suspected ACMs from the property and put it in my dumpsters. And Mr. Fillers replying, well, that's none of your business. If we look throughout the record in this case and these discussions back and forth, we hear nothing about Mr. Mathis other than doing the work, the demolition, and then up to a point where Mr. Mathis had an argument with Don Fillers about, hey, there may be some hazardous materials in some of these tanks or some of these big containers for some types of liquid, and after that fuss, Mr. Mathis stopped the work. The only evidence, it seems to appear, that would directly tie Mr. Mathis to any kind of conspiracy to violate the Clean Air Act was from Halbert Warden, who was the individual who was actually hired and began performing some of the abatement. Mr. Warden has said in the record here that, in a discussion with Mr. Mathis, that there were some issues about other suspected ACMs, asbestos-containing materials, and that Mr. Mathis's response was that he lowered his head and said, Don just doesn't want to pay for any more of it. Now, he's talking about Don Fillers, that's all. About Don Fillers, yes. Now, that segues me to my other part of my argument. I guess before you move on, wouldn't Mr. Warden's testimony be indicative that Mr. Mathis knew that there was this asbestos on the property during the demolition process that was being conducted by Mr. Mathis and his company? Judge, I would say that that was, at best, tenuous, because the evidence, when you look at it, it looks like it would go either way when it talks about context. Because, first, we don't have time frames as to when that discussion actually occurred. How soon before the fuss occurred, the disagreement occurred between Mr. Mathis and Mr. Fillers over this hazardous material that he came about. I would state, Your Honor, that Mr. Warden testified, and his testimony would counter that, that he actually saw Mr. Woods and a female doing work improperly. I believe that was the Blackburn lady. Doing work improperly, removing lagging, removing stuff from piping, and putting it into a dumpster that Mr. Warden was using. Mr. Warden refers to these materials bagged up as ghost bags, and that when Mr. Warden confronted the Fillers about it, that the bags had disappeared. And then, Your Honors, I'd like to point out something that Judge Collier mentioned in the record, and this was during the motion for a directed verdict, but I think it's a theme throughout this entire case, is that the trial court stated, in the dialogue with trial counsel, is that the knowledge of the individual employees, Lumpkin, for example, Floyd, for example, of Mr. Mathis, the knowledge of those employees, that there may be some ACM still out there that was being removed improperly, should be imputed or inferred to Mr. Mathis. Now, that's a unique argument in criminal law. I would suggest that it's more appropriate to respond to superior in a tort claim, which we argue this is more of a negligence tort action than it is a criminal claim. But to infer that all this knowledge from Mr. Warden, from Mr. Lumpkin, from Mr. Floyd, should be imputed to Mr. Mathis simply because he was the employer, or in this case Mr. Warden had contracted with him to get some work done, should be imputed to him and therefore meet the mens re standard. Now, before your time expires, would you address the conviction for a violation of the 10-day notice, the Clean Air Act notice, you know what I'm referring to? Yes. My concern is that the government, I think, has taken the position that Cathy Jones, who was employed by the Environmental Bureau or whatever it was, according to the government, she said something to the fact that she was convinced all along that these estimates of the amount of asbestos were given to her by Mr. Mathis. But on cross-examination, and the government has that in its brief at pages 21 to 22, and I'll ask the government attorney about this, but it seems to me that she says on cross that, what I try to say all morning is that I'm not sure who gave me these numbers. So I have concern about whether the government has correctly cast a record as to Ms. Jones' testimony. I just want to know what your response is. Cathy Jones, in charge, it was the Air Pollution Control Board of the City of Chattanooga. Yes, it's our position that she confused Mr. Warden with Mr. Mathis. She seemed to be the linchpin in this particular case. She comes out after Mr. Schultz says, hey, I might have found some violations here, and she comes out there with some work boots but no other protective materials, looks around, goes up to Mr. Mathis. It might be best if we could just have a podium there. We don't have a jury here, it's just Judge Seiler and me. I forget I'm not in the trial court. But she walks around, goes up to this orange trailer, for example, that Mr. Mathis was using at Park for another job and looked at it and looked around and picked up some samples. And then it seems in the record that she is confusing statements and comments from Mr. Warden and applying that sometime later to Mr. Mathis, almost like, uh-oh, I made a mistake. I need to start backpedaling a little bit because it does appear that there is some violations out there. She shouldn't have approved the work on that case with the notice, and she should not have just approved, for example, anything else with Mr. Mathis's trailer. So we would submit that we think that her characterization as to Mr. Mathis is misplaced, that she was confused, and that it should have been more applied to Mr. Warden, who was actually the one that was in charge of doing the abatement and therefore was responsible for getting or at least giving the 10-day notice to the government. Thank you, Mr. Flores. Your time has expired. You'll have your two minutes of rebuttal. Yes, sir. Okay, thank you. Good morning, Your Honors. Leslie Corey for Donald Fillers. I will not be addressing the same issues that Mr. Flores addressed. We had raised six issues on appeal. The three that I would like to touch on today are the warrantless search issue, which is the only one that strictly involves Mr. Fillers, and then the two sentencing issues. Your Honor, it's our contention that the district court misapplied the open fields doctrine in determining that this 1700 block of Whatcom Street Project was an open field. If you look at the case law, the nub of the definition of an open field is land on which the public is authorized to go whether or not the owner consents. This property, this block, was clearly property that Donald Fillers was authorized to keep people off of. The district court itself, when it was making a determination about his privacy interests, said that. It said Donald Fillers had the authority to keep people off that property. Did he exercise that authority at all? Were there any signs, any fences, security guards, monitors, anything that would indicate that people should not go on the property? Because as I understand it, part of the property didn't have any barrier at all, right? Your Honor, at different times it was in different conditions. When the two investigators came onto the property, first of all, there are two sides of the property that are elevated, and one side had a building on the end of it. So the public wasn't going to get on those sides anyway. Then there were two other sides where the grade decreased gradually until it was at ground level or street level. And the public could get on there. And on the day that the investigators came, they were able to go down the street and just walk onto that property. However, even at that time, the property was a demolition site. The person who actually cleared it away said the entire site was littered with at least six inches deep of demolition debris. It was a site that by its very nature would have kept people off of it. The only people who came on it were people who wanted to steal salvage material. I think if you look at the meaning of a privacy expectation, in Mr. Filler's case it is rooted in his property rights. He bought the property to make a profit. He contracted to have it demolished. He was going to split the proceeds of the salvaging with Mr. Mathis. As long as Mr. Mathis was on the site, there wasn't an issue with people coming on the site and stealing salvage material. When that summer they had this dispute and Mr. Mathis walked out, there was a period of time where Mr. Fillers was in trouble. He did not have a mechanism for keeping people off of the site. That doesn't mean he wanted them there. It just meant for a term he was not able to keep them off. He did have David Wood who lived across the street. There was an affidavit submitted in connection with our motion to suppress saying that Mr. Wood, part of his job was to monitor the site. However, at that point, the investigators didn't see anything. I think they commented they saw one person sifting through trying to pull out some salvage. But, Your Honors, they never gave it time to find out whether Mr. Fillers was exhibiting an expectation of privacy. They came on the site. Then they came back and entered the site and took the three samples. If there had been people working there and just weren't there that particular day, they wouldn't have known it. They didn't give it a chance. Do you agree that the site was easily accessible by the public, at least on one side? Your Honor, I would not agree that it was easily accessible because it was littered with debris. It was in the state that a demolition would be on its final stages. The building was almost completely down. There was demolition debris everywhere. It was in the city, right? It was in the city. It was actually a city block. It was contiguous to Mr. Fillers' own property. That's how he became aware of it to start with. It backed up to his business. And he's in the wood business. He wanted to salvage the wood out of the business. That's why he bought it. If I could go on briefly to the sentencing issues. Your Honor, the first issue, the six-level increase for continuous or repetitive discharge of toxic material. The court itself, when it was making its final determination, after it had heard all of the evidence and was deciding about the substantial likelihood of death or serious bodily injury, made the finding that the government had not produced evidence to show that any asbestos fibers entered the environment. If that is so, and I believe it was, there could not have been a discharge of toxic material, which is the requirement. Forget the repetitive or continuous. There wasn't proof of a discharge of toxic material. We have the Zimmerman Report showing that all or most all of the asbestos was removed during the actual abatement. We have the deposition testimony of Herbert Worden, who was the abatement contractor who says that Gary Fillers took him through the entire site and he disposed of all of the asbestos except what might have been locked in between walls and that would not have become visible until the demolition started. And finally, we have all of the air monitoring samples. The final air monitoring sample was conducted in 2005 when they were cleaning away the demolition debris and the contractor there put up air monitors around the perimeter of the site to make sure that while they were doing cleanup, no asbestos was getting into the air. Those monitors showed clean air. The government produced no evidence that there was a discharge of toxic materials. Then the final issue, the nine-level increase for a substantial likelihood of death or serious bodily injury, the judge simply misinterpreted the law in that case also. He took the meaning substantial likelihood and he said that means considerably more likely. But then, rather than saying what he should have, considerably more likely that someone would die or suffer serious bodily injury than not die or suffer serious bodily injury. That would have been the correct standard. Instead of that, what he said was it's considerably more likely that someone who was exposed to asbestos on this job will die or suffer serious bodily injury than if they had never been exposed to asbestos at all. That is simply the wrong standard for him to have used. It is a considerably more likely than not standard. The way he worked it, it basically made the principle of substantial likelihood of death or serious bodily injury meaningless. Unless you all have any more questions, I'll be seated. Thank you very much. May it please the Court, Matthew Morris on behalf of the United States of America. Your Honors, what I would like to do is address the points that, major points that have been addressed by counsel for Mr. Fillers and Mr. Mathis.  The first of which is the sufficiency with regard to count two because Judge Cole, you rightly asked about whether or not there is sufficient evidence to convict for the jury to have convicted Mr. Mathis on that count. And what I would point to are a number of things that were in the record and that were in the testimony which established that he knew and was involved with the submission of what was a 10-day, it was termed a 10-day notice, but it was actually a demolition permit application. He was the demolition permit contractor per the contract that he entered to with the Watkins Street Project. Furthermore, he had the survey. He had the survey that Watkins Street Project commissioned to assess the amount of asbestos that was in the facility. He provided that to one of the abatement contractors that they asked to bid on the property on the abatement, but who ultimately did not get the job. Is this the survey where I think there is an assertion by Mr. Mathis that he did not have all of the pages of the survey? The assertion was... By someone? It was not that Mr. Mathis made that assertion. It was the regulators asserted that they testified that they received versions of the survey that were incomplete, and that was what was central to the obstruction conviction of Mr. Mathis on Count 11. I know there was some question about the completeness of the survey and attached pages. So there was one of the contractors that was SCI Remediation, an asbestos abatement contractor, was contacted by Mr. Mathis, and he said, here's the survey. The survey was clearly provided to them because it was referenced in the bid that SCI Remediation provided to Mr. Mathis. But the fault of the survey was the missing pages, or was there something else? There was no fault in the survey, Your Honor. It was complete, and at least the version that was used by Mr. Mathis and Mr. Fillers to get bids from asbestos abatement contractors. Those are asbestos abatement contractors that did not ultimately get the job. Doesn't Mr. Mathis contend that he left some portions of maybe it's the demolition permit request blank, and that those portions were filled in by someone else? Maybe someone with the agency, maybe by Mr. Fillers, maybe by Mr. Warden, but not by him. Am I correct? You are correct. The contention is not that who put the numbers on there, but the source of them. I think the testimony was clear that Kathy Jones completed, filled it out, with information that was provided by Mr. Mathis and Mr. Fillers. And you're correct that her testimony, Kathy Jones, who was the person who was over the asbestos program for the city of Chattanooga, said that she was pretty sure that James Mathis furnished the initial figures, but it could have been ultimately the asbestos abatement contractor that was ultimately hired. She was not sure who it was, but she was pretty sure that it was James Mathis who provided the initial figures that went into that permit application. Is that enough to convict him on that? Well, Your Honor, I... She's pretty sure, but she's not... There was other evidence, Your Honor. First of all, there was the fact that he went, that James Mathis went there and left, assuming that she's right, that the jury did not believe Kathy Jones when she said that James Mathis provided me that number. There still was sufficient evidence to convict him on count two of providing that false demolition permit application. First of all, the fact that he would go in there and jointly participate with, after he's already had the survey, that he would jointly participate with Donald Fillers in completing that survey is suggestive of the conspiracy. And keep in mind, Your Honors, that this, count two, was also alleged on an aiding and abetting theory. Secondly, it's important to note that the application resulted in a permit that was issued to James Mathis that had the false numbers in there, that had the numbers that grossly understated the amount of asbestos that was identified in the survey that was originally obtained. My concern, I don't want to spend time on this, but it does seem that the brief at pages 21 to 22 is maybe a little more, make sure I say this the right way, affirming in terms of Mrs. Jones' conviction, her belief that she got these numbers absolutely from Mr. Mathis, when in fact she seems to suggest in testimony that she wasn't sure, she thinks maybe it was Mr. Mathis, but it could have been Warden, it could have been Fillers, it could have been somebody else. And so it just seems to me that the brief is a little overly ambitious, and maybe I'm not being fair, but that's my sense. Your Honor, she definitely equivocated on that and was not certain as to who provided those numbers. Also, it's important to realize that there was testimony in the record that James Mathis had been trained in the identification and removal of asbestos, and that he had decades of experience in the demolition field, which helped support the fact that he knew the process, that he knew what was in the buildings, and that he and the jury could reasonably infer from the totality, not just from Kathy Jones' testimony, that James Mathis was involved in submitting the false demolition permit application to the Air Pollution Control Bureau. With regard to the issues that were addressed by counsel for Mr. Fillers, the search issue, firstly, Your Honors, of course this is an issue that has been well-briefed by both sides, but it's clear that there were no manifestations. Whether or not Don Fillers had the right to keep people off his property, of course he did. He could put a fence around it. He could tell people, keep off. He could put a guard out there. But he did none of those things. Did he have to do that? I mean, this is pretty much a demolition site. Wouldn't members of the public know that this is an old, what, factory that was being demolished? This is not, you know, there's no sort of invitation to the public to just traverse the property, to go in and take salvage or whatever they may want to do. So one could infer an expectation of privacy on the part of Mr. Fillers. It's his property. Shouldn't have to go to the expense of having a guard or erect a fence. Well, Your Honor, I would suggest that because of the status of the property, those are things he should have done. It was a hazardous location. There were, in addition to the demolition rubble, there was, asbestos was found on the site, as well as other materials. And he made no effort, if he had that expectation, he made no effort to manifest it by keeping people off. What's your best case to show that this is an open field and therefore they could march around and pick up samples? Your Honor, I would say the Oliver 1984 Supreme Court case as well as the Jardines 2013 Supreme Court case support that there was no, that an open field such as this is, there are no reasonable expectations of privacy on it. Now, oftentimes there's reference, the cases deal with marijuana patches or that sort of thing, but this was an open urban field. It was an urban, yes, it was an urban environment, but again, there were no fences, no signs, it was an inactive demolition site, and the fact that it was in the city of Chattanooga rather than out in the county somewhere, nevertheless, it's appropriate for the court to conclude, and there was no clear error in concluding that it was an open field and that he had no reasonable expectation of privacy in it. With regard to the sentencing issues, Your Honor, the first enhancement having to do with repetitive releases, the Cattucci case out of the First Circuit in 1995 made it clear that two releases are sufficient. Now, Mr. Filler's counsel says, well, there's no proof that it was released into the environment, but, Your Honor, I would submit that this, the fact that witnesses testified that they were involved in dry removal of asbestos, or what appeared to be asbestos, that asbestos was found on the ground and that they were sweeping it up, bagging it up, throwing it into buggies, dumping it into dumpsters with no respiratory protection whatsoever, is sufficient for the application of this 2Q1.2B1A repetitive release enhancement. Mr. Filler wants to rely on his argument that they got it all, that ADC systems got it all, so, therefore, there wasn't any to be released to the environment. But one of the suppositions, incorrect suppositions of that premise, is that she ignores the fact, or Fillers ignores the fact, that his own workers, at the same time that ADC systems was engaged in their abatement, his own workers are pulling asbestos down, bagging it up, and throwing these ghost bags into ADC systems dumpsters. So, whether or not they got it all, and it's clear they didn't get it all because it was on the ground, and that there was a clean-up resulting in the expenditure of thousands of dollars, tens of thousands of dollars to clean it up, discredit that theory that ADC systems got it all, so there wasn't any to be released to the environment. His counsel suggested that air monitoring showed that none of the asbestos was getting into the air. How do you fit that in? Well, Your Honor, none of the air monitoring, no air monitoring was being conducted while the illegal abatement was going on. That was subsequent to that, you're saying? Well, there was air monitoring that was done when ADC systems was there, but when the other workers testified that they were involved in this activity, or when ADC systems was over here in their containment area doing air monitoring, and the fillers' employees are elsewhere, there was no air monitoring going on where the illegal activity was occurring. Now, EPA responded to the emergency on the site and came and did air monitoring, and there was no asbestos detected in the air, but first of all, there had just been a rainfall event, and it wasn't contemporaneous with the removal of the asbestos. This was air monitoring that had occurred after the site was found to be dormant by the regulators. With regard to the substantial likelihood of death or serious bodily injury, the court correctly concluded, the trial court below correctly concluded, that it's enough to show that it was substantially more likely, not that they would suffer death or serious bodily injury, not that it was a 51% chance that somebody was going to get sick or die, but just that it was substantially more likely that they were exposed to risk of death or serious bodily injury. So it's not a 51% rule, and that's clear. It's a substantially more likely as a result of the activity standard, and that was Judge Collier relied on the Thorn decision out of the Second Circuit and rejected the Pearson standard from the Ninth Circuit in coming to that conclusion. So therefore, unless the court has additional questions of me, Your Honors, I will ask that the court affirm the convictions in this case and the sentences. Okay. Thank you, Mr. Morris. Mr. Flores? Your Honor, it may please the court, because the critical issue here, I think the court's identified, is with Cathy Jones. My colleague uses terms such as suggestive, and that's where I go to my, you know, where's the beef argument here? You know, you suggest all day long, that may give rise to a preponderance, but not proof beyond a reasonable doubt. Here with Cathy Jones, we do have some problems with her and her ability to recall. First of all, Mr. Mathis relied upon the AAI survey in drafting his permit to the APC. Second of all, and just as important, the information in that permit application came from the wardens and not from Mr. Mathis. If we were to look at the permit itself or the application for that, the permit cited approval for demolition and did not include abatement. And then, most critically, and it's undisputed in the record, Cathy Jones was unable to remember who provided the numbers associated with the size of the area to be abated. She just couldn't recall. What is suggestive in the record is that she mixed some people up. She made some comments to Mr. Schultz that James Mathis couldn't read or write, and she had to help him. That's more applicable to Mr. Warden than it is to Mr. Mathis. I think the court will look at sentencing and see how eloquent Mr. Mathis was when he addressed Judge Collier during his allocution. A very eloquently spoken man, well educated, and it's just incredible to think that Ms. Jones would make this comment that he couldn't read or write, and therefore she had to help him with it. I suggest that the evidence would show that Ms. Jones just made a mistake, Mr. Mathis got caught up in this vacuum and zeal of the government's prosecution of this case, and he was more of a dupe than anything else, and we would request, Your Honors, to grant one of our reliefs that we've asked for in our conclusion. Thank you. Thank you. Your Honors, because Donald Filler's name keeps coming up in regard to the insufficiency of the evidence on count two, I would like to address that just briefly to point out. Donald Fillers never even saw the 10-day application or the 10-day notice. His brother, Gary Fillers, was involved in the 10-day application. Herbert Worden was involved in it. James Mathis was involved in it. When Kathy Jones wrote down who to contact, she wrote down Gary or Donald Fillers, but she wrote down Gary Filler's phone number. When she sent out the approval of the application, she sent it to James Mathis, Herbert Worden, and Gary Fillers. The only involvement by Don Fillers is Ms. Jones claims that one day Donald Fillers called her and told her that Herbert Worden told him that they needed to increase the amount of asbestos, that there was more than Herbert Worden had put in, and Donald Fillers gave her more numbers. The government repeatedly conflates Gary Fillers with Donald Fillers. They repeatedly conflate what is demolition dust with asbestos. None of the people who identified asbestos were competent to identify asbestos. They were talking about demolition dust. Finally, Your Honor, in terms of the Oliver case, I would put up the Sixth Circuit Allender case as an excellent example of how the court should reason on what constitutes a privacy right in commercial property. Donald Fillers, that would be 808 Fed 2nd, 1180. This is exactly the kind of property that is protected under the Fourth Amendment. Mr. Fillers had an expectation of privacy by virtue of his having purchased the property and having a plan to make money off of it. As long as Mathis was there, it was safe. Thank you, Your Honor. Okay. Thank you, Ms. Corey. Thanks to all counsel for your arguments today. We very much appreciate them. The case will be submitted, and we would like to take this opportunity to thank you, Ms. Corey and you, Mr. Flores, for taking the case or the cases under the Criminal Justice Act. It's a real service to Mr. Fillers and Mr. Mathis and to the court at large, so thank you very much. And with that, the case will be submitted. Thank you.